HEARD NOVEMBER TERM, 1873.

GLENN *vs.* COUNTY COMMISSIONERS OF YORK.

An Act incorporating a railroad company provided in one of its Sections that it shall be lawful for any County or town interested in the construction of the road to subscribe to the capital stock of the company " such sum, and to be payable in such manner, as the people or proper authorities of such County or town shall deem best, determine and authorize," and that at all meetings of the stockholders the County Commissioners of any County shall appoint some one to represent the stock of their County : *Held,* That by " proper authorities of such County " was meant the County Commissioners thereof, and that they had the power to subscribe to the stock without referring the matter to the people or electors of the County.

BEFORE MACKEY, J., AT YORK, AUGUST TERM, 1873.

Action by E. L. Glenn and others against H. K. Roberts and others as County Commissioners of York County.

The plaintiffs, taxpayers on real and personal property in York County, exhibited their complaint before His Honor Thomas J. Mackey, on the 3d day of July, A. D. 1873, setting forth their character as such taxpayers ; that the defendants are the County Commissioners for York County ; the Act incorporating the Chester and Lenoir Narrow Gauge Railroad Company, and the 11th Section thereof, in words as follows, (15 Stat., 395):

" SEC. 11. That it shall be lawful for any County or town interested in the construction of the said Chester and Lenoir Railroad to subscribe to the capital stock of said company, or of any company with which it may consolidate or unite, such sum, and to be payable in such manner, as the people or proper authorities of such County or town shall deem best, determine and authorize ; and in all meetings of stockholders, the County Commissioners of the respective Counties, and the Town Councils of the respective towns, shall appoint some person to represent the stock of their respective Counties and towns : *Provided,* That the property of the said railroad company situated in this State shall be subject to taxation during the existence of their charter."

The complaint further sets forth " that the defendants, on the eleventh day of April, A. D. 1873, held a meeting as County Commissioners, and adopted the following preamble and three resolutions as the official action of the Board of County Commissioners :

" Whereas the General Assembly of South Carolina did, by an Act approved February 26, A. D. 1873, incorporate the Chester and Lenoir Narrow Gauge Railroad Company, and did authorize the

said company to construct a narrow gauge railroad from the town of Chester, by the way of Yorkville, to some point on the line dividing the States of North and South Carolina, in the direction of Dallas, in the County of Gaston, in the State of North Carolina; and whereas, by Section 11 of said Act, it is declared that 'it shall be lawful for any County or town interested in the construction of the said Chester and Lenoir Railroad to subscribe to the capital stock of said company, or of any company with which it may consolidate or unite, such sum, to be payable in such manner, as the people or proper authorities of such County shall deem best, determine and authorize;' and whereas it is manifest to us that the County of York is greatly interested in the construction of the said Chester and Lenoir Railroad, as a valuable and much needed internal improvement, which will tend to advance the greatest good of the largest number of the people of York County; and whereas the best guaranties are furnished that the said railroad will be constructed within a brief period; therefore,

"*Resolved* by the County Commissioners of York County, That the sum of $100,000 be, and the same is hereby, subscribed for and on behalf of the County of York to the capital stock of the Chester and Lenoir Narrow Gauge Railroad Company.

"*Resolved*, That the said subscription of $100,000 shall be by bonds of the County of York, bearing interest at the rate of seven per cent. per annum, and redeemable in twenty years from the date of issue; and for the punctual payment of the interest, and the redemption of the same at maturity, the faith and credit of York County shall be inviolably pledged.

"*Resolved*, The said bonds shall be issued in the denomination of one hundred dollars only, and an annual tax sufficient to pay the annual interest thereon shall be levied on the real and personal property in the County of York subject to taxation."

That the defendants will soon issue the said bonds; that this will subject the plaintiffs to an additional annual tax; and the complaint then prays for an injunction against the issuing of said bonds upon several grounds, all of which were abandoned on the argument, except the following:

X. That the said defendants have no lawful authority to make the aforesaid subscription of $100,000, nor to issue the said bonds, for—

1. They derive no such authority from their office as County Commissioners.

2. They are not the people of the County, nor the proper authority of any town.

3. The aforesaid Act of the General Assembly only gives them authority to appoint persons to represent the stock which York County may own in the said railroad company.

7. The issuing of the said bonds by the defendants is not authorized by law.

His Honor thereupon granted the following order:

On the sworn complaint in the above entitled action, and upon the same submitted as an affidavit, a motion being made by Mr. Rion, of counsel for the plaintiffs, for a preliminary injunction against the defendants, and upon the case as stated in said complaint, sufficient reason appearing why the same should be granted, it is hereby ordered that, until the further order of this Court, the defendants be enjoined and restrained from issuing the bonds proposed to be issued by the defendants as the County Commissioners of the County of York in payment of a subscription of $100,000 towards the construction of the Chester and Lenoir Narrow Gauge Railroad.

And on the said complaint, and the same submitted as an affidavit, let the defendants or their attorney shew cause before me on the sixteenth day of July, instant, being Wednesday, at ten o'clock in the forenoon, at York Court House, why the foregoing order, or some order to be made of like purport and effect, should not be continued in full force, and until the final judgment and decree in this suit; and until the foregoing order is modified, let the same be in full force and effect.

. This the 3d July, A. D. 1873.

The papers having been served, the defendants filed their answer denying that Section 11 of the Act incorporating the Narrow Gauge Railroad Company was correctly set forth in the complaint; denying that the proceeds of the aforesaid subscription were applicable to the construction of the road-bed and track of a railroad outside of the limits of York County, and alleging that it was distinctly understood and agreed with said company that the proceeds of said bonds were to be expended in the construction of the afore-

said railroad within the limits of York County, and that more than the amount of said subscriptions would be necessary for the construction of said railroad through York County, alleging that said railroad was necessary for the internal improvement of York County; that said County would be greatly benefitted thereby, and that said subscription, as made, was much needed and required for the building of said railroad, and alleging that, by the Constitution of South Carolina, and the Acts of the General Assembly of said State, and more especially by the aforesaid Act incorporating the said railroad company, the defendants, as County Commissioners of York County, are lawfully authorized to make the aforesaid subscription and issue the aforesaid bonds.

The defendants admitted as true all other matters of fact alleged in the complaint; and the plaintiffs, before trial, admitted as true the matters of fact alleged in the answer.

On the 16th day of August, 1873, the cause was heard upon its merits before His Honor Judge Mackey, who, on the 12th day of September, 1873, filed the following order and decree:

MACKEY, J. An interlocutory injunction was granted in this action on the 3d day of July, 1873, restraining the defendants from issuing the bonds proposed to be issued by them, as the County Commissioners of York County, in payment of a subscription of one hundred thousand dollars to the capital stock of the Chester and Lenoir Narrow Gauge Railroad Company, which said subscription was made by the defendants for and on behalf of the County of York. The defendants having been required to show cause why the said injunction should not be continued in full force, the case came up on the 16th day of the said month for a final hearing upon the merits, under the general issues involved in the pleadings.

It appears that the respondents, as County Commissioners of York County, have subscribed, as alleged by the plaintiffs, and now propose to issue, bonds in the name of the County of York, in payment of said subscription, such bonds to be redeemable in twenty years from the date of issue and to bear interest at the rate of seven per cent. per annum; and for the payment of the annual interest on such bonds, the said defendants, as County Commissioners, propose to levy an annual tax on the real and personal property subject to taxation in the County of York.

The plaintiffs, who are taxpayers of York County, deny the right of the defendants, the County Commissioners, to subscribe and issue the said bonds, and allege that the issuing of the said bonds by the defendants is not authorized by law and will subject the plaintiffs to an additional annual tax upon their real and personal property in the County of York, which tax, the plaintiffs allege, will be wrongful and illegal, and will inflict upon them, as taxpayers of York County, a loss and damage to the extent and amount of such proposed tax.

The defendants reply that they are authorized by law to subscribe and issue the said bonds, and that they derive such authority directly from Section 11 of an Act of the General Assembly of South Carolina, approved February 26, 1873, entitled "An Act to incorporate the Chester and Lenoir Narrow Gauge Railroad Company, and to authorize the consolidation of said company with the Carolina Narrow Gauge Railroad Company and the King's Mountain Railroad Company." Section 11 of said Act is as follows, to wit:

"SECTION 11. That it shall be lawful for any County or town interested in the construction of the said Chester and Lenoir Railroad to subscribe to the capital stock of said company, or of any company with which it may consolidate or unite, such sum, and to be payable in such manner, as the people or proper authorities of such County or town shall deem best, determine and authorize; and in all meetings of stockholders the County Commissioners of the respective Counties, and the Town Councils of the respective towns, shall appoint some person to represent the stock of their respective Counties and towns: *Provided,* That the property of the said railroad company situated in this State shall be subject to taxation during the existence of their charter."

The real issue, the *questio vexata,* in this case springs from the diverse interpretations given to the words in the above Section—"*the people or proper authorities of such County or town,*" etc.

The learned counsel for the plaintiffs presented an exposition of these words hostile to the powers claimed by the defendants, which exposition was marked by the greatest opulence of legal research, and a most profound analysis and rational and plausible application of the rules of grammar, which should guide the judgment in its interpretation of spoken and written language.

It is an exposition, however, which, while it strikes the mind with invincible force when applied to the words in question,—

isolated from the body of the Act of which they are an integral part—yet, in the judgment of the Court, it is not supported by the context. The conclusion of the learned counsel upon this point appears to be the result of viewing the statute in question unequally, and without due regard to kindred legislative enactments under which several Counties of this State have subscribed to the capital stock of railway companies and issued bonds in payment of such subscriptions.

That illustrious jurist, Chancellor Kent, laid it down as an established rule in the exposition of statutes that "the intention of the lawgiver is to be deduced from a view of the whole and of every part of a statute taken and compared together. The real intention, when accurately ascertained, will always prevail over the literal sense of terms. When the expression in a statute is special or particular, but the reason is general, the expression should be deemed general."—Kent Comm., vol. 1, part 3, 510.

It was urged by the learned counsel for the plaintiffs that the words "*the people or proper authorities of such County or town*" should be construed to mean "the *people* of such County or proper authorities of such town." In other terms, the plaintiffs contend that "the people," or, what is synonymous with the people, the majority of the duly qualified electors of the County, must first authorize the subscription by their votes in the case of the County; but the Intendant and Council of the town may subscribe directly, on behalf of the town, they being the "proper authorities of such town."

The plaintiffs, in support of this construction, refer to the fact that hitherto no such power of subscription has ever been exercised or even claimed by the County Commissioners of any County in this State, and that no County in South Carolina has ever issued its bonds in aid of the construction of railroads until after the majority of the people of such County had, by their votes at the ballot box, authorized such issue. The fact cited by the plaintiffs, so far from re-enforcing the plaintiffs' construction of the words now immediately under review, would appear to be fatal to the conclusion based upon that construction. While it is true that no County of this State has subscribed or issued bonds to the capital stock of a railroad company except pursuant to a vote of the people of such County, it is also true that every Act heretofore enacted which authorized a County to issue its bonds in aid of the

construction of a railroad specially and expressly provided that, as a condition precedent to such issue, the majority of the qualified electors of the County should authorize such issue by their votes. The only Act of our General Assembly in relation to County subscriptions to the capital stock of railroad companies which does not expressly provide for a popular vote on the question of such subscription is the Act under which the defendants claim to exercise the power of subscription to such capital stock without being authorized thereto by a popular vote.

In expounding statutes, we should have regard to what may properly be termed the comparative interpretation of laws; that is, we should not only collate and compare the several parts of the statute in question, but we should compare the whole statute with other statutes enacted by the same legislative body in reference to the same subject, and thus determine the real purpose and intent of the legislator, both by what is expressed and by what is omitted in the statute under consideration.

It is true that the County subscriptions hitherto made in aid of railway construction in this State have been made by the authority and under the sanction of a popular vote. It is also true, however, that the several Acts of the General Assembly which have heretofore authorized and empowered a County to make such subscription not only provided in expressed terms, *in totidem verbis,* that such subscription should first be authorized by the majority of the legal voters of the County, but also supplied the means or agencies by and through which the judgment of the majority might be expressed, such as authorizing the County Commissioners and the Mayors or Intendants of towns to call conventions of the taxpayers in the County and towns respectively to consider the question of submitting the proposed subscription to the popular vote; and also prescribing the mode in which such submission should be made, the appointment of managers and the manner of declaring the result of the vote.

All of this elaborate machinery for securing an expression of the popular will at the ballot box is wanting in the Act of the General Assembly now under consideration. Is it not, therefore, a conclusive presumption of law and of sound reason that the General Assembly in this Act designed that the Counties interested in the construction of the Chester and Lenoir Narrow Gauge Railroad might subscribe to the capital stock of that company without

being authorized thereto by a popular vote? To conclude otherwise is to assume that the Legislature, in dispensing with an important condition which it has heretofore invariably annexed to a grant of power, meant to qualify and restrict the exercise of the power granted, the same as if it had expressed that condition. Such assumption would be an unwarrantable depreciation of the law-making power. The Courts are bound to hold that the General Assembly of the State means what it says and says what it means, although we may sometimes be reminded that Lord Coke complained, even in his day, that "great questions have oftentimes arisen upon Acts of Parliament overladen with provisos and additions, and many times penned or corrected by men of none or very little judgment in law."

I am constrained to conclude, after a careful survey of the authorities cited and the arguments adduced by the learned counsel for the plaintiffs, that when the General Assembly declared, in Section 11 of the Act to incorporate the Chester and Lenoir Narrow Gauge Railroad Company, "that it shall be lawful for any County or town interested in the construction of the said Chester and Lenoir Railroad to subscribe to the capital stock of said company, or of any company with which it may consolidate or unite, such sum, and to be payable in such manner, as the *people or proper authorities* of such County or town shall deem best, determine and authorize," it intended to vest the power of subscription, on behalf of the County, in the " proper authorities " of the County, without the intervention of a popular vote. Any other conclusion would demand also a transposition of the words of the statute, which would carry the Court into the forbidden domain of legislation.

It was urged, however, by the plaintiffs that the term " proper authorities " does not necessarily designate the County Commissioners rather than the County Treasurer. I cannot perceive any difficulty in defining the term " proper authorities," viewing it in the light of the context and in relation to the subject matter of the proposed subscription. Public officers are definable by their usual functions; and when a doubt arises as to what officers are intended by a statute that vests officials with a new power, or imposes upon them new duties, that doubt may be best solved by ascertaining whether the statute relates to a matter which is germane to the office of those who propose to exercise the power or perform the duty.

The statute relates to the construction of a railroad passing through the County of York. A railway is designated in the General Statutes of this State as a "public highway," (*vide* G. S., Chap. 63, Sec. 75,) and it is manifestly a valuable internal improvement. Section 19, Article IV, of the State Constitution provides that "the qualified electors of each County shall elect three persons, for the term of two years, who shall constitute a Board of County Commissioners, which shall have jurisdiction over roads, highways, ferries, bridges, and in all matters relating to taxes, disbursements of money for County purposes, and in every other case that may be necessary to the internal improvement and local concerns of the respective Counties: *Provided*, That in all cases there shall be the right of appeal to the State Courts."

This language of the Constitution defining the jurisdiction of the County Commissioners, considered with reference to the subject matter of the statute in question, points to them with unerring index as the "proper authorities" of the County, alone empowered to act in the premises. Indeed, the statute itself clearly forbids any other conclusion in declaring that "the County Commissioners of the respective Counties shall appoint some person to represent the stock of their respective Counties."—*Vide* Sec. 11. But, even though the Constitution were less clear and comprehensive as to the powers of County Commissioners, their authority to act in the premises is deducible from the very nature of their office.

By the Act of 1868, (Gen. Stat. S. C., Chap. 18, Sec. 34,) each County is declared to be a body politic and corporate. The County Commissioners are those officers through whom the County performs its general functions of government. They are charged with the local administration, and constitute the highest political tribunal in the County. Under the Constitution and laws of this State, they exercise *quasi* judicial, legislative and executive functions. They exercise a supervisory power over all the public officers of the County. When assembled as a Board, they may punish any open or direct contempt of their authority. They are required to examine, settle and allow all accounts chargeable against the County, and draw orders on the County Treasurer for the same. They are empowered to cause to be levied, collected and paid to the Treasurer of the County such sum of money as may be necessary to construct bridges therein, and to prescribe upon what plan and in what manner the moneys so to be raised shall be expended; to make such

orders concerning the corporate property of the County as they may deem expedient, and to lay out and construct public highways.— *Vide* Gen. Stat., Chap. 19. They are designated by law as the only officers empowered to borrow money for the use of the County, to be expended for the purchase of any real estate; and no County can create such loan until the General Assembly shall, upon notification by the County Commissioners, authorize them to create it.

The distinction attempted to be drawn, in the argument of the plaintiffs, between Counties and municipal corporations, does not appear to be very material to the main issue, nor is it well founded. That a County is a "municipal corporation" cannot well be denied.— *Vide* 2 Kent Comm., 275; Bla. Comm., 4, 411; *People* vs. *Morris*, 13 Wend., 325-335; *Horton, Judge & Co.* vs. *Mobile County School Comm.*, 43 Ala., 598; 2 Bouvier Law Dic., 193. And in *Thomson* vs. *Lee County*, the Supreme Court of the United States use the expression "a County or other municipal corporation." In that case Mr. Justice Miller says: "Most certain it is that as to all their rights, powers and responsibilities, three grand classes of corporations exist: first political or *municipal corporations, such as Counties*, towns, cities," etc.— *Vide* also *Swann* vs. *Williams*, 2 Michigan, 427; 1 Coler on Munic. Bonds, 374.

That the Legislature may authorize a County, or the proper authorities thereof, or any other municipal corporation, to subscribe to the capital stock of a railroad company within its limits, or to aid in the construction of any other internal improvement for the public benefit, and issue bonds to pay for such subscription, or borrow money on the faith of such bonds, has been repeatedly declared in decisions of the Supreme Court of the United States and the Supreme Court of many of the States of our Union.

This power, so delegated, may, if the Legislature please, be exercised without the sanction of a popular vote, its validity being dependent upon the intent of the legislative body in delegating the power to the local administration; the effectiveness of the grant of power not being subject to impairment by the absence of a popular ratification on the part of the local constituency.— *Vide Thomson* vs. *Lee County*, 3 Wallace, U. S. S. C. Rep., 327; *Gillman* vs. *City of Sheboygan*, 2 Black, 510; and *Barto* vs. *Himrod*, 4 Seldon, 433. In comment upon this last case, it is said in 2 Coler on Municipal Bonds, 206, "all general reasoning is rendered unnecessary by the

explicit determination in the case of *Barto* vs. *Himrod.*" But while general statutes must be enacted by the Legislature, it is plain that the power to make local regulations, having the force of law, in limited localities, may be committed *to other bodies representing the people in their local divisions* or to the people of those districts themselves. Our whole system of local government in cities, villages, Counties and towns depends upon that distinction. The practice has existed from the foundation of the State and has always been considered a prominent feature in the American system of government.

In *Sharpless* vs. *Mayor of Philadelphia,* (21 Pa. St. Rep., 147–148,) the Supreme Court of Pennsylvania says: " The Legislature may lawfully authorize municipal corporations to subscribe to the capital stock of railroad companies, *and such authority may be given directly to the corporate authorities or it may be made to depend upon the assent of a majority of the corporators.*"— *Vide* also *City of Bridgeport* vs. *Housatonic R. R. Co.,* 15 Conn., 475; *Clarke* vs. *City of Rochester,* 14 Howard Prac. Rep., 214; *Bank of Rome* vs. *Village of Rome,* 18 N. Y. Rep., 33; *Cincinnati R. R. Co.* vs. *Clinton County,* 1 Ohio St. Rep., 77; *Williams* vs. *The New York Central R. R. Co.,* 18 Barb., 233–246; *Carry* vs. *Commissioners of Wyandotte County,* 20 Ohio, 10.

The power to delegate authority is a distinct power of the State. The American system of government is one of complete decentralization, the primary and cardinal idea of which is that local affairs shall be managed by local authorities. In this country, beginning with the illustrious Marshall and Kent, the vast preponderance of judicial authority is with those who affirm that railways are public institutions of great and manifest benefit to communities, and the Legislature may either impose taxes directly in aid of their construction or delegate the power to the political subdivision of the State within whose immediate territorial jurisdiction such railways are to be constructed.

In the case of *Rogers* vs. *Burlington,* decided in the Supreme Court of the United States, Mr. Justice Clifford, in delivering the opinion of the Court, said: " Railways, as a matter of usage, founded on experience, are so far considered by the Court as in the nature of improved highways, and as indispensable to the public interest, and the successful pursuit even of local business, that a State Legislature may authorize the towns and Counties of a State

through which a railway passes to borrow money, issue their bonds, subscribe for the stock of the company, or purchase the same, with a view of aiding those engaged in constructing or completing such a public improvement.

In the case of *Olcott* vs. *The County Board of Supervisors of Fon du Lac County*, decided in the Supreme Court of the United States at the December Term, 1872, the Court say : " That railroads are public highways, has been the doctrine of nearly all the Courts ever since such conveniences have had any existence. It is said that railroads are not public highways *per se*. This is a mistake. In their very nature they are public highways. It needed no decisions of Courts to make them such. * . * * * * If there be any purpose for which taxation would seem to be legitimate, it is the making and maintenance of highways. It is also a County purpose," etc.

In the case of *The Louisville and Nashville Railroad Company* vs. *The County Court of Davidson County*, (1 Sneed, 637,) it was decided that " the object of a tax in respect to a railroad passing through the County is a ' County purpose,' within the meaning of the Constitution of Tennessee authorizing taxes for County or corporation purposes."— *Vide* also *McCoy* vs. *Washington*, 3 Phil. Rep., 290, (United States Circuit Court, Pa.); *Taylor* vs. *Commissioners of Newberne, N. C.*, 3 Jones Eq., 141 ; *Steen* vs. *Mayor of Mobile*, 24 Ala., 591; *State, ex rel. James Copes*, vs. *City of Charleston*, 10 Rich., 491.

In this last named case, it appeared that under the charter of the city of Charleston, S. C., (Act August 13, 1783, 7 Stat., 98,) the City Council were " vested with full power and authority to make every by-law or regulation that shall appear to them requisite and necessary for the security, welfare and convenience of the said city," and " to make such assessments on the inhabitants of Charleston, or those who held taxable property within the same, for the safety, convenience, benefit and advantage of the said city, as shall appear to them expedient."

The City Council of Charleston, acting upon their construction of this provision of the city charter, did, of their own motion, subscribe in the aggregate $2,300,000 to the capital stock of various railroad companies, whose lines, then in course of construction, commenced within the corporate limits and extended into neighboring States. The Court of Errors of this State sustained the

action of the City Council as warranted by the charter powers and as a not improper exercise of the authority incident to the governmental administration of a municipal corporation.

The Mayor and Aldermen of a city and a Board of County Commissioners are vested with cognate powers, from the nature of their offices, as the "proper" or representative authorities of their respective corporations.

In the case of *The State, ex rel. Lartigue,* vs. *The Board of County Commissioners of Barnwell County,* decided by our Supreme Court at the April Term, 1873, the Court say, incidentally : " *the said County being a corporation, the representatives of which are the County Commissioners.*"

The plaintiffs further allege that "the subscription, in the manner proposed by the defendants, will result in taking the private property of the plaintiffs, by taxation, for the use of a corporation, without the consent of the plaintiffs, or a just compensation to them therefor, in violation of Section 23 of Article I of the Constitution of this State."

The clause of the Constitution referred to is not pertinent to the matter in issue, nor is the proposed tax in anywise repugnant thereto. Section 23, Article I, of the State Constitution relates to the exercise of the right of eminent domain by the State and imposes a restriction thereon. This is a right entirely distinct in its origin and operation from the power of taxation. In exercising the right of eminent domain, the State takes from the property owner, in property, more than the share that he is bound to contribute, as a citizen, to the general good, *and the State compensates him therefor.* In exercising the taxing power, the State takes from the property owner his exact proportionate share, in money, for the advancement of the common interest, *without compensation,* save in those advantages reflected back upon the individual from the promoted welfare of the community.

The fourth and fifth clauses of the complaint were abandoned by the plaintiffs, in the argument, as untenable.

The further objection, by plaintiffs, that even though the defendants have the authority to subscribe to the capital stock of the said railroad company, they are not authorized to issue the proposed bonds, cannot be sustained. The power to issue the proposed bonds is a corrollary from the authority to subscribe. In every grant of power, there is conveyed the means necessary to make it effective.

I have considered the questions at issue solely upon their merits, and without interposing those technical rules of practice which would have justified the Court, *sua sponte*, in dismissing the complaint. A recent eminent authority on the law of injunctions says that "the issuing of bonds and the levying and collecting of a tax in aid of subscriptions to a railroad by a County Court will not be enjoined on the ground of want of jurisdiction in the Court to take such proceedings without a vote of the people, since a sale of the taxpayer's property, under such proceedings, would not divest the owner of his title and he can maintain an action at law for the property and for damages for its detention."—High on the Law of Injunctions, 215 and 383; *vide* also *State* vs. *Parkville*, 32 Mo., 496, approving *Sapre* vs. *Tompkins*, 23 Mo., 443.

In view, therefore, of the law and the facts in the premises, I am of the opinion that in subscribing to the capital stock of the Chester and Lenoir Narrow Gauge Railroad Company, the County Commissioners of the County of York have exercised a discretion within the scope of their legal powers, and that in aiding in the construction of a railway through the said County, they will be giving a much needed impulse to the civilization and material development of the County, of which they are, by the Constitution and laws, the chief administrative officers.

I do, therefore, order and decree that the preliminary injunction heretofore granted by me in this case be, and is hereby, dissolved, and that the complaint be dismissed with costs.

To the foregoing decree the plaintiffs duly excepted, and appealed therefrom on the following grounds:

I. In that His Honor held that the only Act of our General Assembly in relation to County subscriptions to the capital stock of railroad companies which does not expressly provide for a popular vote on the question of such subscription is the Act under which the defendants claim to exercise the power of subscription to such capital stock without being authorized thereunto by a popular vote; whereas the Act of 18th September, 1868, entitled "An Act to incorporate the Air Line Railroad Company in South Carolina" (under which Act the vote of the people was taken in each County, and in York such vote was adverse to the subscription,) contained like provisions.

II. In that His Honor held that, by Section 11 of the Act of February 26th, 1873, the General Assembly intended to vest the

power of subscription on behalf of the County in the " proper authorities " of the County without the intervention of a popular vote.

III. In that His Honor held that the words " proper authorities," in said Section, are to be construed as " proper authorities of such County," and not " proper authorities of such town," and that by " proper authorities of such County" is meant the County Commissioners thereof.

IV. In that His Honor held that the authority of the County Commissioners to act in the premises, that is to make the subscription questioned, is deducible from the very nature of their office.

V. In that His Honor held that the authority of the County Commissioners to act in the premises, that is to make the subscription questioned, is deducible from the powers conferred upon them by the Constitution and laws of this State.

VI. In that His Honor held that a County in South Carolina is a municipal corporation ; whereas he should have decided that in South Carolina a County is a *quasi* municipal corporation with limited powers.

VII. In that His Honor held that the Legislature of South Carolina may authorize a County to subscribe to the capital stock of a railroad company within its limits without the sanction of a popular vote.

VIII. In that His Honor held that the defendants have the authority to issue the bonds proposed to be issued.

IX. In that His Honor held that in subscribing to the capital stock of the Chester and Lenoir Narrow Gauge Railroad Company the County Commissioners of the County of York have exercised a discretion within the scope of their legal powers.

X. In that His Honor ordered and decreed that the preliminary injunction heretofore granted by him in this case be dissolved, and that the complaint be dismissed with costs.

XI. In that His Honor did not order and decree that the said injunction be continued of force until the subscription might be sanctioned by a vote of the people of York County.

*Rion,* for appellants:

I. The Section under which the County Commissioners acted is one which would be very difficult to construe if we were to be confined to the mere verbiage of the Act. It frequently happens that

an historical inquiry will explain sentences of themselves unintelligible, or which might be understood to mean something very different from their real meaning. For instance, search all our statutes through and one will fail to arrive at the meaning of "benefit of clergy," and one might well suppose those words to mean the receiving of the kind offices of a clergyman when about to be executed.

Let us make an inquiry into the history of this Section and see if we can learn what it means, and why it is apparently so obscure.

We find that it is a literal copy, *mutatis mutandis*, of Section 1 of the Act to aid the Air Line Railroad Company, (14 Stat., 75,) except that the word "city" is omitted. The Air Line Railroad passed through cities in North Carolina, Georgia and South Carolina, while our railroad passes through no city.

Now, in the Air Line Act, the Legislature could not say "Mayor and Aldermen of such *town* or city," nor "Intendant and Wardens of such town or *city*," and hence had the alternative of saying "the Intendant and Wardens of such town, or the Mayor and Aldermen of such city," or, more briefly, as in the Act, "the proper authorities of such town or city." When the Legislature copied this Section it struck out "city," for the reason before given, and left the words as is in Section 11.

Now the Air Line Act was passed in September, 1868, and the practical contemporaneous construction given it was a vote by the people of the Counties, including York.

After this, in February, 1873, the Legislature passed the Section in question, and must be supposed to have intended the same as Section 1 of the Air Line Act, with its meaning practically explained by a contemporaneous construction.

*Contemporanea expositio, est fortissima in lege.*

But why was the Air Line Act left so doubtful and no plan of taking the vote provided ? We find, on inspection of the Act, that the railroad lies in the three States of Georgia, North Carolina and South Carolina. In such cases it often happens that the person who in fact drafts the statute lives in one of the States and has in view the laws of such State. The Air Line Act is evidently drafted by a North Carolinian. Such a one would find, on inquiry, that in Georgia the *Constitution, Article IV, Section* 6, forbids any person from being compelled to contribute to a railroad, except inhabitants of towns and cities, after an election has been had which

results in favor thereof, while in South Carolina no such prohibition existed. Hence the application in Georgia is for a legislative appropriation of so much a mile made by the State, and the proper authorities of towns and cities are allowed to vote subscriptions. In South Carolina the Section is as found, assuming (or not considering the matter) that some general law existed in South Carolina like the general law of North Carolina, which provides:

" AN ACT TO AUTHORIZE THE SEVERAL COUNTIES OF THE STATE
     TO TAKE STOCK IN RAILROAD COMPANIES.

"SECTION 1. The General Assembly of North Carolina do enact, That the County Commissioners of the several Counties in this State shall have power to subscribe stock to any railroad company or companies when necessary to aid in the completion of any railroad in which the citizens of the County may have an interest.

"SEC. 2. That the Commissioners of any County proposing to take stock in any railroad company shall meet and agree upon the amount to be subscribed ; and if a majority of the Commissioners shall vote for the proposition, this shall be entered of record, which shall show the *amount* proposed to be subscribed, to what company, and whether in bonds, money or other property, and thereupon the Commissioners shall order an election to be held, on a notice of not less than thirty days, for the purpose of voting for or against the proposition to subscribe the amount of stock agreed on by the County Commissioners. And if a majority of the qualified voters of the County shall vote in favor of the proposition, the County Commissioners, through their Chairman, shall have power to subscribe the amount of stock proposed by them and submitted to the people, subject to all the rules, regulations and restrictions of other stockholders in such company or companies: *Provided, also,* That the Counties, in the manner aforesaid, shall subscribe from time to time such amounts, either in bonds or money, as they may think proper.

"SEC. 8  The election to be held as for the members of the General Assembly."—Pub. L. N. C., Chap. 174, 417.

Hence it was unnecessary to provide the manner of taking the vote. It seems that, in carrying out the Air Line Act, the elections were held as if the North Carolina law governed.

And the manner of taking the will of the people, as provided by this Act, is so very applicable, that its provisions, or ones of like

character, might well be *implied.* The well known maxim applicable to statutes, "*quanda lex aliquid concedit, concedere videtur et id, per quod devenitur ad illud,*" or, as rendered by Chancellor Kent,, "whenever a power is given by a statute everything necessary to the making of it effectual or requisite to attain the end is implied," is sufficient authority for this.

II. The construction which I place on Section 11 is the same as if it read : "as the people of such County or the proper authorities of such town shall deem best."

For the purpose of construction, words in an Act may be taken distributively.—Potter's Dwarris on Statutes, 230.

The word *people,* in the sentence "as the people or proper authorities of such County or town," cannot be intended to refer to "town." The *people* of a town is neither a usual nor proper legislative use of words. Hence the sentence cannot be equivalent to "as the people or proper authorities of such County or the people or proper authorities of such town." A distribution of words being necessary at once suggests the one I propose as proper. It is the same distribution that would be made in the sentence: "The Admiral or General of the navy or army may order a general court martial for the trial of officers."

The words "Town Councils," or the equivalent, were not used for the reason specified in my preceding point, and "the County Commissioners" are used in the same Section charged with another duty. If the County Commissioners were, *virtute officii,* the "proper authorities" of. the County, then the sentence, "the County Commissioners of the respective Counties and the Town Councils of the respective towns" could have been fully expressed simply by three words, "the proper authorities." This matter of representation of stock is not found in the Air Line Act, (for some reason known to the "North Carolinian,") or else some light might thereby be thrown on this matter.

III. Where a power is claimed for an officer, it is incumbent on those who assert the power to point out the Section of the Constitution or statute conferring the power.

If the matter is left *in doubt,* then it is the duty of the officer not to exercise the power.—Cooley on Cons. Lim., 73.

It is, therefore, incumbent on the defendants to show that "the proper authorities of the Counties" is a proper distribution of the words of the Act, and that the County Commissioners are the *proper* authorities.

IV. But I will take upon myself the burthen of showing that the Commissioners are *not* the proper authorities, as far as a negative can be shown.

1. Section 11 does not state that they are the proper authorities. This has already been abundantly shown.

2. Right reason is adverse to the claim. The construction of all laws must be reasonable. Is it reasonable to suppose that in a State, where all powers not delegated are reserved to the *people*, (Cons., Art. 1, Sec. 41,) where no public debt of the State can be created without a two-thirds vote of the Legislature, and other restrictions besides having to have the sanction of a vote of the *people*, and at a time when the welfare of the State requires all the taxing resources of the Counties to be husbanded to respond to State taxation, that a little legislature of three could, by a vote of two of its members, impose a debt upon the County of $100,000, or $1,000,000, interest to be paid annually, without or against the consent of the *people?*

Our construction is reasonable.

(*a.*) The phrase "people of a County" is the legal language for the legal voters of the County.—Cooley, 28, 29.

(*b.*) A reference of subscription to railroads to the people or voters not unusual.—Cooley, 119.

(*c.*) And legal.—Potter's Dwarris, 422, (8th and 9th.)

Again, the action of the Commissioners, in any case like this, is either such as the *people* would vote for, or as they would vote against. If the people would vote for the subscription, then why not submit it to them,—for this is all we ask in this case? And if the people would vote against the subscription, then no milder terms are appropriate than to say the Commissioners have perpetrated an outrage against the people.

3. Usage in the United States does not countenance the power claimed.

I have in this case made extended inquiry and research, and have been able to find no *one* instance where a statute has authorized County Commissioners (or the equipollent officers) to vote a subscription to a railroad; nor *one* instance, before this case, where such a power was attempted to be exercised.

The nearest I could find was one case where the Commissioners and the grand jury were so authorized; and another case where the United States Court said the Legislature *might* authorize the Commissioners. But in this latter case (*Thomson* vs. *Lee Co.*, 3

Wall., 327,) the Supreme Court of Iowa had changed its ruling, and the Act in question actually provided for a vote of the people.

If the research of the defendants has been rewarded with a nearer instance, they will cite the same to your Honors.

But *usage* can hardly be predicated upon exceptional cases *when found.*

4. The *Constitution* of South Carolina does not confer the power.

If conferred, it must be by Article IV, Section 19, where they are given *jurisdiction* over highways, and in every case of internal improvement; or in Article IX, Section 8, which provides that "the corporate authorities of Counties, townships, school districts, cities, towns and villages may be vested with power to assess and collect taxes for corporate purposes."

Now, while we admit that railroads are "great public highways," and "great works of internal improvements," we deny that they are *the* highways or *the* internal improvements that Section 19 meant; and we deny that they can be included in *the* County purposes referred to in Section 8. Besides, Section 8 does not say that the officers mentioned in Section 19 are the corporate authorities mentioned in Section 8, and the County Auditor, for instance, is *a* corporate authority of a County.

If railroads are the highways meant, then it would be proper for the County Commissioners to build bridges for them and to keep them in repair. They might order out the males of the County and work them five days on the railroad tracks. This absurd result follows, or else it is true that by highways, in Section 19, the Constitution does *not* mean railroads.

5. No statute confers the power.

The provision much relied on, which has been transferred to Gen. Stats., 146, Section 1, is simply an extract from Article IV, Section 19, to which I have referred.

As a statute, it can give no more power than as a part of the Constitution.

I would have the Court bear in mind that Counties are only *quasi* corporations, (Cooley, 241,) and have such character to the extent created by law.

In South Carolina, Counties are corporations for certain expressed purposes *only.*—Gen. Stats., 145.

And townships are abolished, except geographically.—XIV Stats., 313.

In Gen. Stats., 149, 234, 274, the Commissioners have duties respecting highways and borrowing money for County purposes, to which the remarks made respecting the constitutional provisions are pertinent.

The General Assembly, by habitual legislation, assert that the Commissioners have not the power of themselves to levy taxes, etc., for such purposes as the court house and jails.—XV Stats., 121, 289, and *nine* Acts passed same session, as "Section 11" in question.

6. If the *general* powers conferred by the Constitution and statutes were such as to countenance a power of the character claimed, yet there must be specific legislative authority to authorize the Commissioners to subscribe to railroads.—Cooley, 215.

And see *Police Jury* vs. *Britton*, (15 Wall., 566,) (decided December 1872,) which decides that the representative officers of a County invested with the usual powers of administration in specific matters, and the power of levying taxes to defray the necessary expenditures of the County, have no implied authority to issue bonds and coupons. In that case the Supreme Court of the United States well say :

" It would be an anomaly, justly to be deprecated, for all our limited territorial boards, charged with certain objects of necessary local administration, to become the fountains of commercial issues, capable of floating about in the financial whirlpool of our large cities."

7. The policy and spirit of the Constitution is adverse to the power claimed.

Article XVI had been finally ratified before the passage of the Narrow Gauge Railroad Act.

Take the Constitution as it then stood, and there seems to be an acknowledgment that it is but justice to the *people* that debts which they have to liquidate shall not be created without their consent.

8. The Constitution *forbids* the County Commissioners from exercising the power claimed.

If we show this, then it would follow that if Section 11 had, in unmistakable language, conferred the power, yet it could not be exercised.

(*a.*) It cannot be denied that this subscription of bonds and the contemplated issue is the exercise of a *legislative* power. By Article II, Section 1, all legislative power is vested in the General Assembly. By Article I, Section 41, all powers not delegated remain

with the people. Now, while under the rule *delegatus non delegare* it would be improper for the Legislature to *delegate* any of its powers to any *other branch* of government, yet it might not be improper to *remit* an exercise of its powers to the *people.*

(*b.*) The County Commissioners, as known to the Constitution, are *judicial* officers. They are distinctly so characterized by being placed under the heading of *"Judicial Department."*—Art. IV, Const., §§ 19, 25.

Section 19 of Article IV, *"Judicial Department,"* provides:

"The qualified electors of each County shall elect three persons for the term of two years, who shall constitute a Board of County Commissioners, which shall have *jurisdiction* over roads, highways, ferries, bridges, and in all matters relating to taxes, disbursements of money for County purposes, and in every other *case* that may be necessary to the internal improvement and local concerns of the respective Counties: *Provided,* That in *all cases* there shall be the right of *appeal* to the State Courts."

This Section, outside of its location, is clearly *judicial.* The words "jurisdiction," "case," "cases" and "appeal" are conclusive.

The history of this Section shows the same. In the proceedings of the Constitutional Convention, we find this Section first reported as Section 21, ("Judicial Department," 261,) and the words "District *Court,*" where "Boards of County Commissioners" now stand. The change of "District Court" to "Board of County Commissioners" is made on pages 629, 630. Afterwards *"full* jurisdiction" is changed to "jurisdiction," and the words *"Provided,* That in all *cases* there shall be the right of *appeal* to the State *Courts"* added.

And Section 369 of *our* Code designates the County Commissioners as an "inferior Court of jurisdiction."—Gen. Stat., 658.

The County Commissioners are therefore clearly *judicial* officers, and can neither, of their own authority nor by Act of the Legislature be given authority, to exercise legislative powers, for Article I, Section 26, distinctly provides: "In the government of this commonwealth, the legislative, executive and judicial powers of the government shall be forever separate and distinct from each other, and no person or persons exercising the functions of one of said departments shall assume or discharge the duties of any other."

If authorized, they could not *discharge* the duties of the "legislative department."

V. Suppose the construction contended for by the defendants be correct, and that the Section can only be read "the people or proper authorities of the County," and that the Commissioners are "the proper authorities," and, consequently, that the Section reads "the people or County Commissioners of the County," then the power contended for does not exist, for this construction puts the "people" and the "Commissioners" at least upon an *equal* footing. This certainly cannot be questioned. Now this litigation may fairly be said to be a contest between the *people* and the *Commissioners* as to who shall exercise this power of determining the question of subscription; the *statute*, allowing the construction claimed by the defendants, only gives them an *equal* right with the people. In this equipoise, what is to decide the contest?

(*a.*) Need I cite your Honors to authorities holding that in construing statutes that construction most favorable to the *people* is to be given?

(*b.*) Or authorities holding that Acts affecting private property are to be construed favorably to property holders (or the people)?

(*c.*) Or need I again read those Sections of the Constitution which clearly acknowledge the *people* as the source of all power?

(*d.*) Or will your Honors allow the Commissioners to contest this matter with the people who elected them—the creature arrayed against the power which created it?

The claim of the Commissioners is preposterous. They claim to an *exclusive* exercise of this power. The people say: divide the exercise of this power; let the Commissioners determine what amount they think ought to be subscribed, and then let us, who have to bear the burthen, decide whether we will authorize the subscription.

VI. Sound policy and the public good demand that the Commissioners shall be enjoined from issuing the bonds.

My clients represent all parties, races, localities and interests in York County. One is a member of the Legislature, some are friends to the projected railroad, and one at least is a stockholder. The friends of the railroad do not desire the benefit, however great, if thereby the County Commissioners, by a vote of two of their number, can, whenever they desire, impose a new burthen of debt upon the County. The door is not only thrown open to corruption, but corruption is invited. How easy to bribe the majority of a legislature of three! In this case, I am sure, there has been no

bribery; but I am equally sure that if the Commissioners are allowed to exercise the power claimed, that bribery will be attempted in every County in the State.

Article XVI will stand as one great door closed against corruption, and against creating burthens upon the people against their will; while thirty-two smaller doors will be flung wide open, (one in each County,) and the State will soon be made bankrupt by the detail of Counties.

*Clawson*, with whom was *Thomson, Wilson & Witherspoon*, contra:

I. The eleventh Section of the Act incorporating the Chester and Lenoir Narrow Gauge Railroad Company authorizes the "proper authorities" of York County to make the subscription they have made.—Potter's Dwarris on Statutes, 234, 198, 184 and 194; 14 Stat. S. C., 75, 595; 1 Kent Com., 431; *Waller* vs. *Harris*, 20 Wendell, 561.

II. The proper authorities of a County referred to in the Act are the County Commissioners.—Sec. 11 of the Act; Constitution, Art. IV, Sec. 19; Rev. Stat., 732; Rev. Stat. S. C., Chap. 18, Sec. 34, and Chap. 19; *State of South Carolina, ex rel. Lartigue et al.*, vs. *Board of County Canvassers of Barnwell County*.

III. The Legislature may authorize the people or proper authorities of a County to subscribe to the capital stock of a railroad company, and such authority may be given directly to the corporate authorities without the sanction of a popular vote.—*Thomson* vs. *Lee County*, 3 Wall., 327; *Rogers* vs. *Burlington*, 3 Wall., 654–666; *Sharpless* vs. *Mayor of Philadelphia*, 21 Pa. St. Rep., 147, 148; *Gilman* vs. *City of Sheboygan*, 2 Black., 510; *Barton* vs. *Himrod*, 4 Seld., 483; 2 Coler on Municipal Bonds, 206, 207; *Olcott* vs. *County Board of Supervisors of Fond du Lac County*, United States Supreme Court, December Term, 1872; *State, ex rel. Copes*, vs. *City Council of Charleston*, 10 S. C., 491; *Alva Gage* vs. *City Council of Charleston*.

IV. The authority of the County Commissioners to make the subscription is deducible from the powers given them by the Constitution of this State.—Art. IV, Sec. 19; 1 Bouv. L. D., 683; 2 Coler on Municipal Bonds, 207; 1 Coler on Municipal Bonds, 309; Rev. Stat., 352; *Copes* vs. *City Council of Charleston*, 10 S. C., 491; *Louisville and Nashville Railroad Company* vs. *County Court of Davidson*, 1 Sneed, 637.

V. Authority in the County Commissioners to make the subscription necessarily includes the power to issue the proposed bonds.—2 Coler on Municipal Bonds, 339; 1 Kent Com., 433; Dwarris on Statutes, 123; 3 Wall., 666; 41 Pa. St., 278; *Reinboth* vs. *Pittsburg,* eleventh Section of the Act.

1874. *Per Curiam.* In this case, it is ordered that the motion be dismissed.

*Moses,* C. J., and *Wright,* A. J., concurred.

WILLARD, A. J., dissenting. The decree of the Circuit Court holds that under the terms of Section 11 of the Act to incorporate the Chester and Lenoir Railroad Company, (15 Stat., 393,) the County Commissioners of York County have authority to subscribe to the capital stock of such company an amount fixed by them for that purpose. The question raised by the appeal involves the correctness of this decision.

The Section of the Act in question is as follows: "That it shall be lawful for any County or town interested in the construction of the Chester and Lenoir Railroad to subscribe to the capital stock of said company, or of any company with which it may consolidate or unite, such sum, and to be payable in such manner, as the people or proper authorities of such County or town shall deem best, determine and authorize; and in all meetings of stockholders, the County Commissioners of the respective Counties and the Town Council of the respective towns shall appoint some proper person to represent the stock of their respective Counties and towns: *Provided,* That the property of the said railroad company situated in this State shall be subject to taxation during the existence of their charter."

The question is, whether in the case of a subscription under the terms of this Section in behalf of a County the County Commissioners of such County are, in the sense of the Act, "proper authorities of such County," and as such authorized to determine the fact that the County is interested in such improvement, to fix the amount of such subscription, the manner of payment, and to confer authority for the actual making of such subscription.

The question is exclusively one of the proper constructions of the statute and does not involve the constitutional authority of the Legislature to confer upon County Commissioners such powers as they claim to possess in the case under consideration.

The subject of Section 11 is the interest of certain Counties and towns in the construction of a particular work of internal improvement, and the means of advancing that interest, by conferring corporate authority upon any such County or town to acquire, in its corporate capacity, the rights and assume the obligations of a stockholder of the railroad company incorporated by that Act. The object of the provision of Section 11 was to facilitate the construction of the railroad to the extent of such sums as might be acquired to the capital of the company through subscriptions of the character named.

In order to place a proper construction upon the statute, we must apply its language to its proper subject, keeping constantly in view the object of the enactment. The construction of Section 11 cannot be materially aided by special reference to the language of other parts of the Act. On the other hand the proper sense of Section 11 cannot be appreciated without having regard to considerations of public policy, derived from experience under the principles and habits of our representative governments, and which have largely influenced and given form to legislation in cases of a like character.

We are to consider whether the powers in question were intended to be conferred, as it regards Counties, on the body of electors in the modes fixed by law, or upon the Commissioners elected by the people of the County under the authority and for the purposes prescribed by the Constitution and the laws creating the office of County Commissioner and fixing its powers and duties.

The first proposition to be brought to aid this inquiry arises out of a view of the subject under the mode in which it has generally been dealt with in legislation of the class to which the statute under consideration is properly referable. It is this: that the powers conferred by Section 11, assuming them to be conferred upon the electors of the County, are ordinary powers frequently given, and such as have been often sanctioned by both direct legislative and judicial authority, while those powers, assuming them to have been conferred upon County Commissioners, are extraordinary and unusual. They are extraordinary because they are in excess of the proper powers of such officers, and unusual in the sense that such large discretion has not generally been conferred on officers of that class.

This consideration would not be entitled to weight if the language of the Act was clear and indisputable; but as it is doubtful, and needs the aid of construction, it becomes important to ascertain

whether the proposition just advanced is sound and applicable to the case.

It would not be either necessary or convenient to do more than make a general reference to the legislation of this and other States conferring authority upon Counties to aid in the construction of railroads, in order to show that where power has been conferred on Counties to determine for themselves, as corporate bodies, whether they will advance money or assume obligations in aid of the construction of railroads, the practice has been to confer such power of determination on the body of the electors of the County, to be exercised by voting on the measure proposed. If a single instance has occurred throughout the legislation of the extended system of States where such authority has been conferred exclusively upon the ordinary officers of the County, such instance has not been brought to our notice, and the probability of finding such an instance is not sufficient to warrant so extended a research. We must assume that this is the first instance where that has been attempted, if the statute indeed bears the construction put upon it by the respondents. It is clear, therefore, that, measured by the standard of common legislative practice, the powers claimed for the County Commissioners must be regarded as extraordinary and unusual.

It may be doubted whether conferring powers of this character and magnitude upon the ordinary County officers could be regarded as a wise and prudent exercise of legislative powers. Where the Legislature, acting within constitutional limits, makes a clear and explicit exposition of its will and intention, it is not for the Courts to call in question the wisdom or prudence of its determinations; but where the legislative expression is obscure, and public officers, claiming to have derived powers through such obscure expression, come into the Courts to have the limits of those powers made clear and definite through the application of the rules of construction, the Courts are bound to see that the Legislature is not made to speak language that the judgment of the community would condemn as unwise and imprudent.

It is not necessary to elaborate or fortify the proposition that lodging power in the hands of three administrative County officers, chosen without reference to the exercise of such extraordinary powers, and for the purpose of discharging the ordinary duties incident to the corporate business of a County, by which they may bind the County, as stockholders of a railroad corporation, to an unlimited

amount, is of questionable propriety, if not dangerous. The simple enunciation of the proposition is sufficient to secure for it general acceptance.

It must then be concluded that the construction contended for by the respondents will have the effect to place in the hands of the County Commissioners extraordinary, unusual and questionable, if not dangerous, powers, and, as such, cannot be admitted while any better construction is possible.

We have, then, to inquire whether the language of Section 11, fairly interpreted, independently of what may or may not be its tendency and effect, warrants the claims of the respondents. If such is not the conclusive effect of the language of the Act, then we must seek its meaning in accordance with the rules of construction, having regard to the nature of the powers sought to be conferred and the end for which they are called into existence.

The only designation under which the respondents can claim the right of subscription in the name of the County is that of the "proper authorities." If they answer to that description, then, possibly, the grant of authority to the people or proper authorities is sufficient to enable the County Commissioners to act for the County with conclusive effect and without reference to the people in any case within the provisions of that Section.

It is evident that this Section does not assume to create any new office or to confer any new class of powers on any existing office. The language quoted leaves it as a question to be determined by some means independent of the Act itself, who are the proper authorities to carry out its provisions conferring on the electors, under the designation of the people, the right to act in the matter when no proper authorities exist for that purpose. We are, then, to inquire what must be the nature of the powers and duties of any particular office to enable it to answer the description "proper authorities" as it regards the right to act for the County in the case contemplated by Section 11, and then to refer to the Constitution and laws to ascertain whether such powers are vested in the County Commissioners. For this purpose, the precise character of the power in question must be ascertained.

In the first place, the authority conferred is in its nature purely legislative, so far at least as it involves the right to determine the nature and extent of the interest of the County in the improvement and the proper limit of aid under all the circumstances of the case.

Whether determining the mode of payment may not be regarded as a proper subject for the action of administrative officers, need not be considered, as it is a question of subordinate importance as affecting the present case. It would be difficult to find any one exact and concise definition of what constitutes the difference between an act purely legislative and an administrative act, and no exhaustive definition is here attempted. There are, however, certain clearly recognizable attributes of each, about which there can be no mistake, and which will be sufficient to test the present question.

It is not the nature of an administrative act to create new rights or obligations, but to put in exercise such as have already been created by the legislative authority but may be dependent for their practical efficiency on the performance of some official act on the part of an administrative officer. It may be that such right and obligation were created in general terms, and that the persons or other subjects of the Act, or the existence of some fact or state of facts, must be ascertained through the intervention of an administrative officer before the Act can take complete effect according to the intent of the law-maker. On the other hand, the operation of the Act, as it regards such rights and obligations, may be made to depend on some condition involving the discharge of a duty by an administrative officer,—either the performance of an act or the ascertainment of a fact,—which duty may be either discretionary or compulsive. While the principles just stated of themselves give great latitude and importance to the action of administrative officers, still they do not nor can any view taken of the nature of an administrative office sanction the idea that a public policy on a subject collateral to this constituting the subjects of ordinary legislation, such as affording public aid to railroads, can be determined upon and adopted by administrative officers as an act of administrative duty.

The Act in question does not determine that the County shall subscribe, but permits it to do so or to refrain, according to its own views of interest or duty in the matter.

Thus the question of the propriety of such aid, considered from an economic standpoint, the character of the improvement and its adaptation to the wants of the community, the extent of interest that the County has in its construction and the limit of expenditure or of the obligation assumed, as fixed by the present and pros-

pective financial ability of the County, or by more general consid-- erations of economic prudence, are all matters that are left to be considered and acted upon in an entirely independent manner by the people of the County or those that properly represent them in regard to matters of that sort. It is clear and indisputable that such matters can only be properly determined by those in whom legislative authority is vested by the Constitution, or by proper representatives of the people of the particular localities most interested, clothed with power to legislate in their behalf, or by the people acting as electors under the authority of an Act of the Legislature.

Do the County Commissioners possess authority of that kind and degree? It is clear that they do not possess general authority to exercise all such legislative powers as are, or may be, by the Constitution or laws, permitted to the Counties as bodies politic and corporate.

There is no such grant either in the Constitution or laws, either expressly or by implication conferring any such right.

The County Commissioners are, by the Constitution, administrative officers, and the powers conferred upon them must be deemed as circumscribed by the line that separates administrative from legislative functions.

There are two clear grounds for laying down the proposition just stated—the first is, that all the enumerated powers conferred upon them are of that class; and the second is, that their determinations are declared to be appealable into the Courts.—Constitution, Article IV, Section 19.

If those powers were legislative, it is clear that such an appeal would be meaningless, for the Courts cannot, under the Constitution, examine the merits of legislative acts upon the grounds on which they rest or the motives that prompted them.

Their powers as set forth in the Constitution (Article IV, Section 19,) are "jurisdiction over roads, highways, ferries, bridges and in all matters relating to taxes, disbursements of money for County purposes, and in every other case that may be necessary to the internal improvement and local concerns of the respective Counties." The term that here describes the nature of their powers over the various subjects enumerated is "jurisdiction." That term imports authority to expound or apply the laws, and excludes the idea of power to make laws. This word is often used in a broader sense,

but when employed for the purpose of indicating a partition of powers among the different departments of the government must be used in a strict sense. If the word jurisdiction, as here used, could be made as including legislative power, the constitutional grant of power to the County Commissioners would assume a magnitude and importance not only unusual and excessive but such as would threaten the balance between the different members constituting the political body and the very integrity of the powers of the supreme legislative body. If the words "and in every other case that may be necessary to the internal improvement and local concerns of the respective Counties" import a grant of legislative power, it is clearly plenary, and, being constitutional, it would be difficult to understand on what principle the Legislature could control or interfere with its exercise, or even exercise the general legislative function over the same subject as it regards the accomplishment of ends having relation to the internal government and concerns of the Counties. No such anomalous and unprecedented clash of jurisdictions was intended by the Constitution, and we must hold that the word "jurisdiction," as there employed, was intended to describe either administrative or judicial function, as excluding the idea of legislative power. That the County Commissioners are not, in the strict sense of the term, a judical body, is clear, Notwithstanding that body is created by a Section of the Article relating to the judiciary of the State, the office is characterized by the nature of its powers rather than by the place occupied by the provisions of the Constitution that created it.

This view of the nature of the office in question is fully carried out by the legislation on that subject, (Gen. Stat., Chap. 14,) while the effect of such legislation is to limit the powers of the County Commissioners rather than to enlarge them as affecting the various subjects placed by the Constitution under their jurisdiction.

It is clear, then, that the County Commissioners do not possess any general right to exercise any and all functions of a legislative character that may be vested in or permitted to the Counties as bodies politic and corporate ; then, unless they possess special legislative power in regard to a class of subjects embracing or at least analogous to the one under consideration, they are clearly destitute of the powers that would qualify them to be recognized as the proper authorities of the County in the sense of the Act in question.

The only power possessed by them at all analogous to the present is that of borrowing money for the purchase of lands, the erection of buildings, &c., (Gen. Stat., 149,) but this power is clogged with the following provision : " *Provided*, That no such loan shall be created by the County Commissioners until they notify the General Assembly of the necessity thereof and authority be granted to them to create said loan." This not only shows that they were considered by the Legislature as destitute of the powers claimed in this case, in the only analogous case directly placed within their jurisdiction, but that the Legislature deemed it impolitic to leave in their hands the right to create obligations to bind the County in the most necessary cases. If they cannot be trusted by the Legislature to borrow money to the limited extent necessary for the purpose of supplying County buildings, is it to be supposed that the Legislature intends to confer upon them unlimited power to bind the County by a subscription to a railroad in which the County as a corporation has only an indirect and speculative interest? The only possible answer is in the negative. We must then conclude that in employing the expression "proper authorities," the view of the powers of the County Commissioners just presented was in the mind of the Legislature, having the effect to exclude County Commissioners from what was intended to be embraced within the terms of that expression.

Arguments have been pressed by both parties, based upon the order in which certain words and expressions stand in the Act, but they can have little right where the construction of the Act turns upon grave questions arising out of the nature of the powers sought to be conferred. It must generally be assumed that the legislative mind was looking to the consequences and effects to flow from its action rather than to the proper grammatical adjustment of the expression through which that intent is conveyed. The ground upon which the present construction rests involves vital and fundamental considerations, before which questions of literal accuracy and elegance must give way. But even these arguments present a view that strengthens the present conclusion. If the views expressed are sound, then the expression " proper authorities " applies to corporate bodies represented by municipal legislative bodies, and the expression " the people" relates to Counties that have no such legislative bodies. Such a construction gives effect to every part of the statute, while the argument of the County Commissioners

would leave no case in which the people would have a right to act to the exclusion of the public authorities, and would deprive that provision of the Section of all importance and effect.

It has also been urged that the clause of Section 11 that authorizes the County Commissioners to appoint a person to represent the Counties in the meetings of stockholders when such subscriptions are made evidences an intent to give them like power as it regards the original subscription. The powers exercised in the two cases are in no respect analogous.

The County Commissioners are clearly the proper authority to appoint such representatives, as they are the general custodians of the corporate property and rights, and, as such, proper parties to look after the interests of the County as affected by the action of the stockholders. On the other hand, the fact that the County Commissioners are named as it regards the lesser and clearly administrative duty, points the omission of their names, as it regards the higher and more important legislative function, as intentional.

The conclusion of the Circuit Court was clearly erroneous. The judgment should be set aside.